[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
CT Page 1163
The parties intermarried in Darien, Connecticut on August 21, 1993. The plaintiff husband has resided continuously in the state of Connecticut for more than one year next preceding the date of the filing of the complaint. There are no minor children issue of the marriage. The evidence presented indicates that this marriage has irretrievably broken down and judgment may enter dissolving the marriage on that ground.
The husband, age 31, is in good health. Since graduating from college, he has been employed by various corporations in sales positions, all in Connecticut. In 1995, his salary was $40,500.00 and he earned a bonus of $2,800.00. His 1996 gross pay through and including September 15, 1996 was $35,478.33 (Exhibit 1). Annualized, this sum is $50,087.05 of which $2,600.00 is a bonus. Included in his pay is a $500.00 monthly automobile allowance. The husband's bonus is based upon an incentive plan and performance. The bonus is not guaranteed.
The health of the wife, age 30, and her prognosis is a major issue in this case. The wife's health was good until the end of 1993. She obtained a B.A. in Human Services with a childhood specialty. She received her Masters degree in Educational Psychology with a concentration in the dynamics of learning and teaching and a minor in elementary education. She has been employed full time since she completed her education. She stopped work in the spring of 1995. She was last employed by a Stamford advertising research company earning $38,000 per year. Her current and sole source of income is $2,210.47 monthly from a long term disability income insurance policy.
The parties met in the summer of 1991. The wife was then living in Long Island and the husband was living in Stamford. At that time the wife was employed at Adelphi University as a counselor and a teacher to learning disabled students. The husband was employed in a Connecticut corporation in a sales capacity. The husband had moved to the marital home at 334 Weed Avenue, Stamford, Connecticut just prior to the parties meeting. The wife moved in with the husband at 334 Weed Avenue in December 1991. She remained until she vacated the home just prior to the commencement of this law suit. The husband continues to reside in the marital home. CT Page 1164
The party's major asset is the real property located at 334 Weed Avenue, Stamford. The title is joint. At the time that the husband moved into the house in 1991, the house was owned by his mother's cousins who he referred to as an aunt and uncle. The husband made arrangements with them to rent the property and he moved into the house prior to his meeting his wife. He characterized the arrangement as a rental with an option to purchase after a year. It's a small cape cod consisting of one bath, two bedrooms, a living room and kitchen all on one floor. In 1991 the attic was unfinished. The husband intended to improve the home including finishing the upstairs area after the purchase.
From and after December 1991, when the parties resided together in the house at 334 Weed Avenue, the wife contributed $200.00 a month towards the cost of maintaining the property. Both parties purchased groceries. She stopped making these payments when she vacated the home.
The husband inherited money from his grandmother in 1990. On May 12, 1992 the husband took title to 334 Weed Avenue. The purchase price was $195,000. The husband obtained a $130,000 mortgage. The wife did not contribute any sums to the purchase price of the property. She continued to pay the $200 per month. The $65,000.00 down payment, plus the closing costs were paid by the husband from the inheritance from his grandmother. These costs totalled approximately $73,000.00. The carrying costs of the home increased from $600 per month rent to $1,404 per month mortgage. There was no evidence indicating that the real estate taxes and insurance were included in the $1,404 monthly payment.
Prior to the August 21, 1993 marriage, the parties refinanced the house for a new $146,200.00 first mortgage. The purpose of the refinance was to reduce the interest rate, lower the monthly payment and obtain cash for home improvements. That refinance netted $18,000.00 cash. At that refinance the husband conveyed an undivided one-half interest in the property to the wife. The property has remained in joint names since that time. The wife co-signed the $146,200 mortgage.
The court has examined the various closing documents and the income of the parties. Although the wife contributed no cash to either the purchase of the property or to improvements, the wife's co-signing the $146,200.00 mortgage permitted the parties to obtain that first mortgage on the property. Sweet v. Sweet, CT Page 1165190 Conn. 657, 663 (1983); O'Neill v. O'Neill, 13 Conn. App. 300,311 (1988). The parties used the net refinance funds to remodel the upstairs bedroom and bathroom and to pay both for the wedding and the honeymoon.
In August 1993, the wife's assets consisted of a $1,400 401K plan, a small checking account, a joint savings account in the amount of $3,000.00 with the husband and the joint real estate. She had an automobile. She had an outstanding student loan of $12,000.00.
In August 1993 the husband had $23,000.00 to $24,000.00 in a savings account, the joint real estate, a checking account, Utah Medical stock worth $1,400.00, and a truck that was sold around the time of the wedding which netted $6,200.00. Some of the $23,000.00 to $24,000.00 in the savings account came from the $146,200.00 refinancing. He owned a 1990 automobile.
After the marriage, various home repairs were made and the upstairs project was begun. The total amount spent to date for those projects was slightly in excess of $50,000.00. The husband paid for those expenses out of the $18,000.00 net proceeds from the refinance, his inheritance from his grandmother, the sale of the medical stock, the sale of the truck and his SBA loan. The original SBA loan now has a balance of $8,319.00. The husband is paying off the SBA loan at the rate of $43.00 per month.
The court heard testimony from the parties concerning the reasons for the breakup of the marriage. A substantial amount of litigation time was devoted to diaries maintained by the wife. The diaries covered the period shortly after the parties met to the date of trial. The court does not believe it is necessary to outline the causes of the dissolution, since the court has already found that the marriage has irretrievably broken down. There is fault on both sides. The predominate cause for the dissolution is attributable to the wife.
Due to her illness, the wife has not been employed since March, 1995. Due to the financial problems caused by the wife's lack of income, the parties applied for and obtained a joint $40,000.00 home equity loan on August 4, 1995 to consolidate their debts. From the home equity loan, the following was paid: (1) the wife's graduate school loan in the amount of $11,754.47, (2) a prior loan of $4,983.92, and (3) a prior joint home equity loan of $10,634.60. After these payments and the closing costs, CT Page 1166 the proceeds from the $40,000.00 home equity loan were $11,430.01.
The wife applied for benefits from her long term disability insurance policy in mid 1995. She received a retroactive long term disability payment of slightly more than $6,000.00 which she deposited in the joint checking account in September 1995. She immediately withdrew approximately $4,000.00 to pay her medical bills and COBRA insurance payments from her former employer.
The husband, in his claims for relief, recognizes the wife's illness and has offered alimony at the rate of $125.00 per week for a period of one year, non-modifiable as to amount and term. He feels the wife is regaining her health and will soon be able to be employed. He is asking that the real estate be conveyed to him upon his payment of a $10,000.00 lump sum to the wife. He will hold her harmless from any and all debts and liabilities arising out of the ownership of the real property. The husband claims that he expects to earn $48,000.00 from his 1996 employment. He is receiving $600 a month from a tenant. His total income of $55,000.00 cannot support a refinance of the $181,000.00 current mortgage balances. The husband claims that he has already exceeded mortgage underwriting standards. He will have to borrow the $10,000.00 lump sum from family members.
The wife, in her claims for relief, is asking for periodic alimony of $800.00 per month with a second look in two years. She asks that the house be sold. After payment of the encumbrances, closing costs and the payment to the husband of his original $65,000.00 down payment, she requests that the balance be equally divided. In the alternative, the husband can buy out the wife's interest for $41,500.00. She claims that she contributed not only cash to the house, but convinced the husband's aunt and uncle to sell the house to him. She also claims that without her earnings the husband would not have been able to qualify for the current mortgages. She also claims credit as the homemaker. She wants an additional $2,881.91 from the husbands's IRA, 401K and credit union savings account. She claims that she needs sufficient money to purchase a new car. Her current car is a 1986 Volkswagen Jetta which is in poor shape. The wife notes that the husband is driving a 1994 Ford Taurus four door sedan. She argues that the husband has a greater earning capacity and considering her health, the husband has a greater capacity to acquire assets in the future. She seeks $10,500.00 attorney's fees. CT Page 1167
The parties offered testimony concerning the division of personal property. They apparently cannot agree on the division of personal property and have specific claims as to individual items. For example, one claim made by each party is that since it was their money that purchased the specific item of furniture, they should be awarded that piece of furniture. Exhibit 5 was offered into evidence showing a purchase on October 15, 1984 of a matching couch and love seat for $2,841.78 including the $800 down payment.
The wife claims that she is suffering from a condition known as chronic fatigue syndrome. She claims that in the fall of 1993 she first noticed a change in her health. Her activities decreased and she lost a few days from work. At first it was no more then three days in a row. Thereafter she continued to lose more time. In late 1993 and early 1994 she saw a number of doctors including the following specialties: infectious disease, gynecology, psychology and neurology. In that period of time her symptoms went into periodic remission. In early March 1995, her ability to work full time deteriorated and she made arrangements to work at home. She was not successful in these endeavors. She started to take continuous sick days in March 1995 and never returned to work. Her salary stopped in June 1995.
The wife applied for long term disability payments from UNUM Insurance Company. She finally received a retroactive disability payment in September 1995 in the amount of $6,000.00. She currently receives disability in the amount of $2,210.47 gross per month. This is her sole source of income. She is not employed.
Since receiving her masters degree, she had been continuously employed until 1995. Her Adelphi University job paid $20,000 in 1991. In late 1991, she was earning approximately $22,000.00 per year in a marketing firm. That increased in 1992 to $25,500.00. In 1993, when she was employed in a White Plains marketing research company, her salary was $30,000.00 and she left at that rate. She was paid $38,000.00 at the Stamford advertising research firm. She started that job in January 1994. She was paid at that same level when she left in the spring of 1995.
The disability insurance company, UNUM, requires periodic updated medical data in order to continue the disability payments. Her last updated medical report was early 1996. She has supplied the insurance company with the necessary data to satisfy CT Page 1168 their payment requirements. Since the inception of the disability payments in June 1995, she has continuously received the monthly benefits.
She was eventually referred to Dr. Benjamin H. Natelson, Professor in the Department of Neuroscience, UMDNJ-New Jersey Medical School and Director of the Chronic Fatigue Syndrome Center. Dr. Natelson testified at the trial. The court had some difficulty with the testimony of the wife and that of Dr. Natelson concerning the effects of chronic fatigue syndrome on the wife and her ability to work. For example, she testified that her symptoms were more or less consistent since their first onset in the fall of 1993. Yet her diary in January of 1994 states that she was able to walk two miles on a number of occasions that month. After her fatigue symptoms commenced the wife started to train for the New York Marathon. She began marathon training in the spring of 1994 and interrupted training on a number of occasions. She continued the training and eventually stopped in November 1994. She did not run in any marathon. At times, during 1994 she was able to run distances of up to four miles.
This court evaluated the wife's testimony and that of Dr. Natelson with the skepticism that would normally follow such evidence. The court is satisfied that the wife's symptoms are real and that her testimony is credible in regards to her symptoms. The court accepts the testimony of Dr. Natelson in finding that indeed the wife is suffering from chronic fatigue syndrome, a recognized medical malady, which under the circumstances of this case does prevent the wife from being employed.
Dr. Natelson indicated that he is a nationally recognized expert on the symptomatology and treatment of chronic fatigue syndrome. In addition, he has a private practice in Newark. He is engaged in private practice slightly less than one day a week. Most of his week is spent in research and the administration of his CFS centers. He also has clinical duties at the VA Hospital in neurology.
He has published 158 treatises and many of those relate to chronic fatigue syndrome (CFS). The Chronic Fatigue Syndrome Center is one of only two research centers in the United States receiving federal funds for the study of CFS. He is a director of both the private fee producing clinic and the research arm of the federally funded center. CT Page 1169
Dr. Natelson sees one to two new private practice patients per week and that has been consistent from 1989 through 1996. In addition he follows up on current patients. The wife is one of his private patients.
Dr. Natelson testified that CFS was first recognized by the medical community in 1989. He created a CFS Center in 1990. In 1988 the following medical definition was established for CFS. "CFS can be diagnosed when the following appear: (1) A loss of 50% regular activity, (2) No other medical explanation for this loss of activity and (3) At least eight of the ten symptoms appear and persist over a six month period of time. The ten symptoms are: (1) chills and fevers, (2) sore throat, (3) swollen glands, (4) headaches, (5) myalgia (aching muscles), (6) joint pain (arthritis), (7) increased fatigue at the examination, (8) cognitive complaints, (9) unrefreshing sleep, and (10) general weakness."
Dr. Natelson saw the wife professionally in 1996. The first exam by his clinic was on June 2, 1995. A work-up was done and records of her prior medical treatments were reviewed by Dr. Natelson and his staff. Dr. Natelson, in order to determine CFS, adds one more component to the three reflected above. That additional component is an evaluation of the intensity of each of the ten symptoms that comprise the third prong of a CFS analysis. Dr. Natelson indicates that he rates the symptoms on a five point scale. He will not recognize the symptoms unless they are substantial; i.e. a rating of at least four on a five point scale.
In conducting the initial evaluation of the wife, Dr. Natelson referenced each of the ten symptoms and made an initial diagnosis of CFS. Based on that evaluation, Dr. Natelson found that (1) the wife's activity resulted in a loss of more than 50%, (2) there was no adequate medical explanation for this loss of activity and (3) all ten of the symptoms were present at a substantial valuation of four points or more. Dr. Natelson then diagnosed the wife as suffering from CFS. At trial he continued with that same diagnosis.
Dr. Natelson last examined and treated the plaintiff on September 27, 1996. At that examination the wife had all ten symptoms: seven substantial and three moderate. Dr. Natelson's opinion is that the current symptoms as of September 1996 fulfill CT Page 1170 not only the classic 1988 definition of CFS, but his own clinic's more demanding definition. Dr. Natelson's opinion is that the wife is unable to work because of the symptoms of CFS.
Dr. Natelson indicated that the prognosis of CFS is usually gloomy. As to the future he stated "I can't tell with reasonable medical probability" the percentage likelihood of recovery. He testified that in a case study of 88 cases of CFS 5% recover completely and a vast majority show some improvement, but usually there is some disability that remains on a permanent basis.
As far as the wife's ability to work, Dr. Natelson said "It's possible that she can work from home with no rigid deadlines or scheduling and may be able to do some work that would not take a great deal of cognitive functioning." When asked if he knew of a job that would fulfill this definition, he could not give an example. In his opinion the wife's cognitive ability has been affected by CFS. She has difficulty in attention and cognitive functioning. She also suffers from dizziness.
Dr. Natelson, on cross-examination, did indicate that the symptoms are largely subjective. There is no laboratory or diagnostic test that can pinpoint CFS. The cause of CFS is not known. No virus has been determined to be the cause of CFS. No mechanism has been determined to cause CFS.
He said that a number of the wife's complaints are similar to psychiatric disorders. In his opinion, psychiatric disorders were ruled out by reason of the medical and psychiatric evaluations conducted on the wife prior to his diagnosis. Dr. Natelson, in response to cross-examination, says that he receives hundreds of questionnaires from different patients around the country for CFS screening. After blood tests and other medical tests are performed, along with a psychiatric exam, only 10% of those applications actually are diagnosed as CFS.
On June 25, 1996, Dr. Natelson wrote a report to the Connecticut Bureau of Disability Determination and stated "I believe Ms. Wainwright to be 100% disabled in her current state. I believe that the severity of Ms. Wainwright's current illness and her symptom complex is consistent with her being 100% disabled". This report was submitted to UNUM in order to obtain the monthly income disability payments.
There is no reported Connecticut case that discusses in CT Page 1171 detail chronic fatigue syndrome. There are a number of cases that do mention the condition. Anastasiou v. Anatasiou,1991 Ct. Sup. 4253, 6 CSCR 585, May 7, 1991 (Bassick, J.). This involved a motion to reopen the judgment filed by the defendant on the grounds that the defendant was suffering from Epstein-Barre disease, and as a result thereof, she suffered chronic fatigue syndrome, total short term memory loss and the inability to understand the fact that the hearing which occurred on October 22, 1990 was a hearing for a dissolution of marriage. Dr. Ross, a psychiatrist, testified concerning Epstein-Barre disease, but there was no further reference in the opinion to chronic fatigue syndrome. Judge Bassick found that the defendant's burden of proof had not been sustained and that there must be finality to judgments. Therefore, the court did not accept CFS as a proper defense to set aside the October 22, 1990 judgment.
Mende v. Collins, 1991 Ct. Sup. 7525, August 2, 1991, (Burns, J.) was a contested dissolution. The wife, at the time of the marriage, was working full time as an attorney for the legal department of an insurance company earning annually $38,000.00. She worked part time after the birth of the minor children at $20.00 per hour. The evidence indicated that during her married life, "the plaintiff has consulted a number of professionals, including physicians, psychiatrists, psychologists and therapists". In her testimony she claimed to suffer from chronic fatigue which, with her child rearing activities prevented her from seeking full time re-employment. She offered the testimony of a specialist in chronic fatigue syndrome. The doctor testified that he first examined the plaintiff in May 1989 and subsequently diagnosed her as suffering from chronic fatigue syndrome. He defined CFS "as a condition of unknown cause whose chief symptom is a debilitating weakness with no improvement after bed rest". The syndrome also involves psychiatric factors; in this case, a major depression. He prescribed various drugs. These include anti-depressants, analgesics, antibiotics and Zantac for stomach irritations. He last saw the plaintiff in January 1991. In his opinion she was not able to resume her employment because the syndrome interfered with her thought process. The defendant offered the testimony of a board certified psychiatrist who offered the opinion that the defendant suffered from a depression as a result of borderline personality disorder. Although the symptoms were similar to those attributed to chronic fatigue syndrome, they were not sufficient to prevent her from being employed. He stated that she should be treated for this condition by "a single, sophisticated psychiatrist who could provide both CT Page 1172 psychotherapy as well as prescriptive drugs". After hearing the testimony, Judge Burns found that the plaintiff was able to resume her former employment, at least on a part time basis, while the child is in school. The court therefore found that CFS did not prevent part time employment.
Michel v. Michel, 1991 Ct. Sup. 9920, November 8, 1991, (Driscoll, J.) was a contested dissolution. The defendant wife, after the birth of the first child of the marriage, began suffering from what was diagnosed as chronic fatigue syndrome. She visited several doctors and ended up treating at the Connecticut Health Center in Farmington, taking medication for the next couple of years. As a result of the medication she was taking, she was able to return to work on a part time basis. The wife testified that she hoped to go back to work but not until the children were all in school, due to day care concerns. Judge Driscoll found that "both defendant and plaintiff complain of health problems, but each appears to be able to do some work. The defendant on a part time basis: the plaintiff on a full time basis."
Kelly v. Kelly, 1992 Ct. Sup. 588, January 24, 1992, (Ballen, J.) involved a dissolution of a 20 year marriage with three children. The plaintiff, 42 and a college graduate, had enjoyed good health but was prone to pneumonia and bronchitis. She currently suffers from chronic fatigue syndrome. The plaintiff worked approximately 29 hours weekly in fund raising activities for Norwalk Community College at $14.00 an hour. Despite the CFS diagnosis, the court found that there is "present and potential earning capacity of the mother when compared to the present and potential earning capacity of the father".
Michel v. Michel, 1992 Ct. Sup. 4584, May 18, 1992, (Ballen, J.) (the same parties as in the first Michel case) was before the court concerning the husband's motion for modification and the wife's motion for contempt. The wife complained that she had decreased earnings created by four factors: (1) she no longer worked for her father as a school bus driver, (2) she needed to care for her own children, (3) her current health problem of chronic fatigue syndrome and (4) her educational pursuits. Judge Ballen apparently did not further consider CFS in this context. He denied the motion for modification because of a failure to show the requisite substantial change in circumstance.
Pereira v. State, 228 Conn. 535 (1994) is the only appellate CT Page 1173 case discussing a fatigue type illness. The plaintiff sought worker's compensation benefits alleging job related stress. She was denied benefits on the basis that the plaintiff's stress did not arise out of or in the course of her employment. This decision was confirmed. The Commissioner's denial of the plaintiff's claim was affirmed by the Supreme Court. The opinion, at page 539, discussed the various symptoms suffered and claimed by the plaintiff. She underlined the various panic attacks and allergies from which she suffered. She claimed to be suffering from severe fatigue. She treated with multiple medical specialists. Yet throughout the entire opinion, there was no specific diagnosis of CFS or a mention of chronic fatigue syndrome.
Fabian v. Craig, 1995 Ct. Sup. 9978, involved a motion to modify visitation decided by Judge Dranginis on September 15, 1995. The plaintiff was forty-two years of age and was suffering from chronic fatigue syndrome. She had been employed by Elizabeth Arden and Chesebrough-Ponds. She had recently graduated from the University of Bridgeport. She apparently was found by Judge Dranginis to be employable despite CFS.
In Nordling v. Harris, 1996 Ct. Sup. 5281, August 7, 1996, (Levin, J.), the plaintiff wife, in a loss of consortium claims in her husband's criminal negligence suit, claimed damages due to her chronic fatigue syndrome. The defendant filed a motion to strike the wife's claim which Judge Levin granted. The decision cited the CFS definition cited above in Mende v. Collins. Judge Levin in a footnote stated that all six prior reported CFS Superior Court cases have been dissolutions of which four were in Fairfield County.
It is the conclusion reached by this court that CFS is not a widely accepted medical diagnosis. It is of recent vintage. The diagnosis of CFS must be accepted with a great deal of skepticism. There is no known cause for CFS. There are no definitive laboratory or clinical tests confirming the diagnosis. The diagnosis is based upon the acceptance and evaluation of subjective complaints. The diagnosis is also based on elimination of other causes which have symptoms that are similar to CFS.
After considering the testimony of the witnesses in this case and bringing to that testimony the skepticism alluded to before, this court is of the opinion that the testimony of Dr. Natelson is credible. The court find that CFS is an accepted medical CT Page 1174 diagnosis.
The court therefore finds that the wife is currently suffering from chronic fatigue syndrome. It finds that as a result of the symptomatology from that syndrome she is not capable of being employed. The court further finds that there is no reasonable prognosis that the wife will be capable of being employed at any time in the near future. Watson v. Watson,20 Conn. App. 551, 556 (1990).
The court further finds that the husband is employed. He has a substantial ability to increase his earnings and to acquire assets in the future. The wife has no ability to increase her assets in the future and no ability to earn money.
The court has carefully considered the criteria set forth in Connecticut General Statutes §§ 46b-81 and 46b-82 in reaching the decisions reflected in the orders that follow.
The following orders may enter.
1. The plaintiff husband shall pay to the defendant wife the sum of $600.00 per month as periodic alimony until the wife remarries, the husband dies or the wife dies, whichever event sooner occurs. The payments are due on the first day of each calendar month, commencing February 1997. The February payment will be prorated from and is due on February 7, 1997. A contingent wage execution is ordered.
2. The husband shall be entitled to the furniture and furnishings currently located in the property at 334 Weed Avenue, Stamford, Connecticut.
3. The court will retain continuing jurisdiction to divide any other personal property.
4. The court finds that the fair market value of the property at 334 Weed Avenue, Stamford is $330,000.00 encumbered by two mortgages totaling approximately $182,000.00. This results in a net equity in the real property of $148,000.00. The husband is entitled to a credit of $73,000.00. The husband shall pay to the wife the sum of $27,000.00 which shall be secured by a third mortgage on said property. Upon the execution of the mortgage deed and promissory note by the husband, the wife shall convey to the husband all her right, title and interest in and to the real CT Page 1175 property at 334 Weed Avenue, Stamford, Connecticut. The husband shall continue to pay for and hold the wife harmless from any and all loans, liabilities, taxes and obligations arising out of the real property. The mortgage deed and promissory note shall contain the following terms:
a) The principal is $27,000.00.
b) The date of the mortgage deed and promissory note will be the date of the execution of the quit claim deed by the wife.
c) The promissory note will bear interest at the rate of seven (7.0%) percent which interest shall accrue from February 7, 1997 until paid in full.
d) The promissory note shall be paid as follows:
1) $10,000.00 principal on June 7, 1997 together with the accrued interest on the entire $27,000.00 from February 7, 1997 until June 7, 1997.
2) Equal monthly payments of the remaining $17,000.00 principal and interest amortized over a period of five years with the first payment due on July 7, 1997 and monthly thereafter.
3) The balance of the principal and outstanding interest shall be due and payable on February 7, 2002.
4) The principal shall become due upon default in the existing first mortgage and/or home equity home loan.
5) The principal can be prepaid without penalty.
e) In the event of default attorney's fees shall be due.
g) The $27,000 mortgage shall be subordinated only to the existing first mortgage in the face amount of $146,200.00 and the home equity loan in the face amount of $40,000.00.
The court will retain continuing jurisdiction concerning the terms, conditions and execution of the mortgage note, promissory note and related documents. The wife shall pay for the recording of the mortgage deed and the husband shall pay for the recording of the quit claim deed. The husband shall prepare the documents at his own cost. CT Page 1176
The husband shall have the option of not performing paragraph 4 of this order and substituting performance of paragraph 5 of this order, which option shall be made by the husband in writing and filed with the court pursuant to P.B. 120 no later than April 1, 1997.
5. In the event the husband signs and files a written option pursuant to paragraph 4 of this order, the real property shall be sold. After payment of the then balance of existing first mortgage and existing home equity loan, broker's commission, if any, and reasonable closing costs, the balance will be divided between the parties equally. Until the property is sold, the husband shall maintain the property in proper condition and pay all expenses therefore including major repairs. The husband will maintain adequate liability and fire insurance. He will pay all current taxes, mortgage payments, home equity loan payments, encumbrances and utilities. The husband will be entitled to receive all rents due from the property as well as the tax benefits of all payments. The court will retain continuing jurisdiction over all terms and conditions of the sales process.
6. In any event the husband shall be entitled to a credit on the wife's share of the house proceeds for $355.00 already paid to the wife from a mortgage escrow overpayment.
7. Each of the parties will continue to own as their own property, free and clear of claims by the other party, all the assets listed on their respective financial affidavits, including IRA's, pension plans and 401K plans.
8. The husband will convey and transfer to the wife all his right, title and interest in and to the 1986 Volkswagen Jetta automobile. The wife will convey and transfer to the husband all her right, title and interest in and to the 1994 Ford Taurus automobile.
9. The husband will pay for all the debts listed in his financial affidavit and hold the wife harmless therefrom, including paying in full the outstanding Visa bill, the Ford Taurus automobile loan and loans to his parents.
10. The wife will pay for and hold the husband harmless from any and all medical bills and hospital bills that are incurred and will be incurred by her, all debts listed in her financial CT Page 1177 affidavit and loans to her parents.
11. The court will not order the reconstruction of the financial affairs or expenses incurred in maintaining the house and/or improving the house since the parties incurred and paid those expenses during their marriage presumably based on their joint agreement.
12. The husband will pay to the wife as an allowance for counsel fees, the sum of $5,000.00 payable at the rate of $100 per week commencing April 21, 1997.
13. The husband will pay for and maintain the wife as irrevocable beneficiary of the $100,000 life insurance policy issued by Northwest Mutual Life for so long as he is obligated to pay periodic alimony. He will provide proof of compliance therewith to the wife, on her written request.
14. Each party will sign all the documents necessary to put into effect the orders of this court.
15. In the event of an appeal, the pendente lite orders of alimony currently in effect will survive this decree, until further order of this court. Yontef v. Yontef, 185 Conn. 275
(1981).
The Plaintiff's counsel will prepare the judgment file.
KEVIN TIERNEY, JUDGE